IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

SHARON CRAVEN,                     §
                                   §
        Plaintiff,                 §
                                   §
vs.                                §        Civil Action No. H-05-709
                                   §
ALBERTO GONZALEZ, ATTORNEY         §
GENERAL OF THE UNITED STATES,      §
                                   §
        Defendant.                 §

## MEMORANDUM OPINION

Pending before the court[1] is Defendant's Motion to Dismiss and for Summary Judgment (Docket Entry No. 35) and the responses filed thereto. For the reasons discussed below, the motion is **GRANTED**.

## I.  Case Background

Plaintiff Sharon Craven ("Craven") filed this employment discrimination action against her former employer for disability discrimination under the Rehabilitation Act and for gender discrimination and retaliation under Title VII of the Civil Rights Act of 1964 ("Title VII").

Craven was employed as Employee Development Manager at the Federal Prison Camp in Bryan, Texas, ("FPC-Bryan") from 1990 to September 19, 1996. In that position she headed the Employee Development Department and was responsible for the department's

---

[1]
    On April 20, 2005, the parties consented to proceed before the undersigned magistrate judge. See Docket Entry Nos. 28-30.

1

budget and the coordination of required training for the facility's employees.  This training included a two-week orientation course for new employees, a forty-hour annual refresher course for all employees covering firearm and self-defense recertification, and other training topics.  She also scheduled employee training at off-site training facilities such as Glynco, Georgia.  In this position, she reported to the associate warden of the facility.

In June 1995, James R. Johnson ("Johnson") became associate warden at the prison camp, replacing John Williams, who retired. In June 1995, Plaintiff was diagnosed with fibromyalgia syndrome. Plaintiff reported that, by the end of a busy week, she would suffer from chronic fatigue and muscle pain and would have to take one to two hours of annual leave.[2]  She acknowledged that she was entitled to take sick leave for these occasions but testified that she took annual leave to keep her sick leave and annual leave "balanced."[3]  Craven testified that she had had the disease for several years before her actual diagnosis, but the symptoms were manageable.[4]  According to Craven, stress aggravated the fatigue

---

[2]

Defendant's Motion for Summary Judgment, Docket Entry No. 35, Attachment A-1, Equal Employment Opportunity Commission Hearing Transcript ("EEOC Hearing Transcript"), Vol. 1, Testimony of Sharon Craven, p. 21.

[3]

Id.

[4]

EEOC Hearing Transcript, Vol. 1, Testimony of Sharon Craven, p. 22.

aspect of the syndrome.[5]

Craven testified that when she became fatigued, she would ask Williams for permission to take several hours of annual leave and that he would allow it without question.[6]  After Johnson replaced Williams in mid-1995, he questioned her about her need for taking leave so frequently.[7]  On July 27, 1995,[8] Plaintiff became ill at

---

[5]
Id.

[6]
The following is a summary of the leave approved by Williams in 1995:
Monday, February 6, 1995, 7:30-4:00, Annual Leave, submitted 2-6-95.
Friday, February 17, 1995, 7:30-4:00, Annual Leave, submitted 2-16-95.
Thursday, March 9, 1995, 1:00-4:00 to Friday, March 10, 1995, 7:30-4:00, Annual Leave, "Oral Surgery," submitted 3-9-95.
Sunday, March 12, 1995, [sic] 2:00-4:00, Annual Leave, "Melissa sick," submitted 3-12-95.
Thursday and Friday, March 16-17, 1995, Annual Leave, Spring Break, submitted 3-9-95.
Tuesday, April 4, 1995, 11:00-4:00, Sick Leave, "Sick child - family leave," submitted 4-4-95.
Thursday and Friday, April 6-7, 1995, Sick Leave, "Sick," submitted 4-12-95.
Tuesday, April 18, 1995, 7:30-4:00, Annual Leave, "Sick child," submitted 4-19-95.
Thursday, May 4, 1995, 7:30-11:30, Sick Leave, submitted 5-10-95.

Exhibit Volume to EEOC Hearing, Ex. 5-B.

[7]
Johnson approved the following leave requests:
Friday, May 26, 1995, 7:30-10:30, 3:00-4:00, Sick Leave, submitted 5-26-95. [Monday, May 29, 1995, was federal holiday].
Tuesday, May 30 - Friday, June 2, 1995, Annual Leave, "Vacation," submitted 4-20-95.
Wednesday, June 7, 1995, 7:30-4:00, Sick Leave, submitted 6-8-95.
Thursday, June 8, 1995, 12:00-4:00, Annual Leave, submitted 6-8-95.
Monday, June 26, 1995, 7:30-4:00, Annual Leave, submitted 6-27-95.
Thursday, June 30, 1995, 7:30-4:00, Sick Leave "Dr. appt. in Austin, Tx," submitted 6-29-95.
Tuesday, July 25, 1995, 2:30-4:00, Annual Leave, "sick," submitted 7-25-95.
Wednesday, August 2, 1995, 3:00-4:00, Annual Leave, submitted 8-2-95.
Friday, August 11, 1995, 7:30-4:00, Annual Leave, "Dr. appt. in Austin with specialist," submitted 8-2-95.
Wednesday, August 16, 1995, 7:30-11:30, Annual Leave, "sick," submitted 8-16-95.
**Friday, August 25, 1995, 12:00-4:00, Annual Leave, "Week-end company" - Monday, August 28, 1995, 7:30-11:30, Annual Leave, "Relatives coming in town," submitted 8-18-1995, not approved.**

work and sought permission from Johnson to go home.  Johnson was
not in his office but was in a meeting with the warden.  Plaintiff
called a co-worker[9] in an attempt to locate Johnson.  She was told
that Johnson and the warden had left to tour the facility.  When
she expressed dismay, the co-worker advised that if she was sick
and had someone in her department cover for her, she should go home
and not wait for Johnson's return.  The next day, Plaintiff was
told by Johnson that, short of leaving work in an ambulance, she

---

Monday, August 28, 1995, 2:00-4:00, Sick Leave, "Dr. appt.," submitted 8-28-95.
Tuesday, August 29, 1995, 3:00-4:00, Sick leave, "Dr. appt.," submitted 8-29-95.
Friday, September 15, 1995, 2:00-4:00, Annual Leave, "Dr. appt. for daughter," submitted 9-12-95.
Thursday, September 21, 1995, 8:30-4:00, Annual Leave, "ill," submitted 9-21-95 (approved by the warden).
Friday, October 6, 1995, 7:30-4:00, Annual Leave, submitted 10-2-95 (Monday, October 9, 1995 was federal holiday).
Thursday, October 12, 1995, 2:30-4:00, Annual Leave, submitted 10-12-95.
Friday, October 13, 1995, 9:00-10:30, Comp Time, submitted 10-13-95.
Monday, October 16, 1995, 7:30-11:30, Sick Leave, "family leave," submitted 10-13-95.
Monday, October 16, 1996, 12:00-4:00, Annual Leave, submitted 10-13-95.
Tuesday, November 21, 1995, 12:00-4:00, Sick Leave, "Daughter to Dr.," submitted 11-21-95.
Thursday, November 30, 1995, 7:30-4:00, Leave without Pay, "Family Leave - ill," submitted 12-1-95.
Monday, December 4, 1995, 11:30-4:00, Sick Leave, "Family Leave," submitted 12-4-95.
Tuesday, December 5, 1995, 7:30-4:00, Sick Leave, submitted 12-4-95.
Wednesday, December 6 - Thursday, December 7, 1995, Sick Leave, "Family Medical Leave Act," submitted 12-8-95.

Exhibit Volume to EEOC Hearing, Ex. 5-B.

[8]
The summary judgment record indicates that on July 25, 1995, Plaintiff took 1.5 hours annual leave for being ill.  There was no leave slip for the July 27, 1995, incident.

[9]
The co-worker, a "Mr. Schluter," had an office close to the warden's office and was in a position to tell Plaintiff if the meeting was still in progress.

must get permission from him for all future leave requests.[10]

On August 2, 1995, Plaintiff submitted a leave slip for one hour of annual leave that day and eight hours annual leave for the following Friday to see a doctor in Austin, Texas. Johnson counseled her about the importance of accumulating leave for future needs on that day and in numerous conversations afterwards. Plaintiff took offense at these comments, believing them to be an attack on her integrity.[11]   On August 16, 1995, Plaintiff had a headache and did not arrive at work until noon. She turned in a leave slip for four hours of annual leave and received another lecture about using annual leave in lieu of sick leave. On August 18, 1995, Plaintiff sought permission to take four hours of annual leave on Friday, August 25, 1995, and four hours of annual leave on Monday, August 28, 1995, because she was entertaining weekend guests. Johnson denied this leave request. On August 21, 1995, Plaintiff wrote to Johnson, demanding to know the reason the leave was denied. Johnson responded, "Due to your recent need to use annual leave in place of sick leave, I will not approve unscheduled leave in an effort to assist you with your medical concerns."[12]

On Tuesday, September 12, 1995, Plaintiff requested eight

---

[10]
EEOC Hearing Transcript, Vol. 1, Testimony of Sharon Craven, p. 36.
[11]
EEOC Hearing Transcript, Vol. 1, Testimony of Sharon Craven, p. 42.
[12]
EEOC Hearing Transcript, Vol. 1, Testimony of Sharon Craven, p. 54.

5

hours annual leave annual leave for Friday, September 15, 1995, citing a doctor's appointment in Austin, Texas. Johnson questioned her reason for scheduling doctor appointments on Fridays. Plaintiff admitted that she deliberately scheduled doctor and dentist visits for Fridays because she believed those days were slow work days.[13]   In the following months, Plaintiff's leave requests were approved by Johnson.

In a letter dated November 6, 1995, Plaintiff's physician, Dr. Robert Howard, opined that Plaintiff's medical condition would make it too painful for her to participate in the upcoming required firearms and self-defense training in January. He stated, "If possible, leave on an intermittent basis or a reduced work schedule may be needed to assist her when chronic pain or fatigue intensifies."[14]

From December 11, 1995, to December 21, 1995, Plaintiff took seventy-two hours of leave without pay, which was designated "Family Medical Leave Act" ("FMLA") leave.   In a letter dated December 15, 1995, Dr. Mahesh Dave, a psychiatrist, stated that Plaintiff was suffering from fibromyalgia and major depression and was unable to perform her duties, at least through January 5,

---

[13]
EEOC Hearing Transcript, Vol. 1, Testimony of Sharon Craven, p. 63.
[14]
Exhibit Volume, Ex. 5-H.

1996.[15]  On  December 21, 1995, Plaintiff requested that her FMLA leave be extended to January 5, 1996.  She requested that her leave from December 22-29, 1995, be deducted from her accrued annual leave and that the remainder be deducted from her accrued sick leave.[16]  This leave request was approved on December 21, 1995.[17]

Plaintiff returned to work sometime after January 9, 1996, but worked intermittently.[18]  The annual training for which Plaintiff had responsibility was occurring during this time period.

On January 23, 1996, Plaintiff's adult daughter went into labor.  Plaintiff asked to take two hours compensatory time, beginning at 2:00 p.m., to be with her daughter.  Johnson agreed. The next day, January 24, 1996, Plaintiff did not go to work, believing that she had prior approval for three days leave whenever

---

[15]

Exhibit Volume, Ex. 5-K.

[16]

Exhibit Volume, Ex. 5-B. p. 45.

[17]

Exhibit Volume, Ex. 5-L.

[18]

Plaintiff took 80 hours leave without pay for pay period 26, ending 1-09-96.  In the next pay period, pay period 1, ending January 23, 1996, Plaintiff worked 27 hours, took 8 hours sick leave, 8 hours "FMLA" leave and 37 hours annual leave.  Plaintiff had requested 32 hours of leave without pay to attend a funeral.  This request was approved for annual leave, not leave without pay. In pay period 2, ending February 2, 1996, Plaintiff worked 19.3 hours, took 2 hours comp time, 1 hour annual leave, 1 hour sick leave and 56 hours leave without pay under the FMLA.  In a letter dated January 26, 1996, Plaintiff requested that certain days be designated leave without pay and others as annual leave.  See Exhibit Volume, Ex. 5-B, p. 51.  In pay period 3, ending February 16, 1996, Plaintiff took 24 hours annual leave 56 hours in leave without pay.  In pay period 4, ending March 1, 1996, Plaintiff took 24 hours annual leave, 48 hours leave without pay and 8 hours "other" leave.  Id.

her daughter delivered her baby.[19]   Instead, she was ordered into work to meet with Johnson and the warden about taking leave during the annual training period.   This was apparently a contentious meeting and Plaintiff became ill from anxiety.   Plaintiff obtained a doctor's appointment and left the facility, taking sick leave for the remainder of the day.   This was the last day Plaintiff worked at FPC-Bryan.   The next day, Plaintiff's attorney faxed to the warden a letter stating that Plaintiff would be on FMLA leave until February 12, 1996.[20]

On February 14, 1996, the warden reassigned Plaintiff from her position as Employee Development Manager to Correctional Program Coordinator.   In her letter to Plaintiff, the warden stated that this reassignment to a less stressful job was based on the medical documentation submitted by Plaintiff and would allow Plaintiff the opportunity to better manage her medical condition.   In her new position, Plaintiff would be responsible for the Inmate Financial Responsibility Program, Institution A&O, and the Release Preparedness Program.   Plaintiff would remain at her GS-11 pay grade and would continue to report to Associate Warden Johnson.

---

[19]

The record reflected that Johnson had written a memo on October 24, 1995, to all department head requesting a projection of their annual leave for 1996. On October 31, 1995, Plaintiff responded that she wished to take 2-4 days between December 15-29, 1995, for the birth of her stepdaughter's baby and 4-5 days off between January 12-31, 1996, for the birth of her daughter's baby.  This request was not in the form of a leave slip.

[20]

Exhibit Volume, Ex. 5-B, p. 51, Ex. 5-N.

8

Plaintiff requested and received an extension of her FMLA leave through March 12, 1996.[21]  On March 12, 1996, she requested another extension of leave through April 16, 1996.[22]  On March 13, 1996, the warden informed Plaintiff that her twelve-week FMLA leave would expire on March 19, 1996, and that she was denying Plaintiff's request for FMLA leave after that date.  Plaintiff did not return to work on March 19, 1996.  Instead, Plaintiff requested and was granted an additional period of leave without pay through May 16, 1996.  On May 13, 1996, Defendant proposed terminating her employment for her failure to return to work.  In response, Plaintiff filed for disability retirement, claiming a disability period commencing January 24, 1996.  Plaintiff was placed on leave without pay status through June 15, 1996.  Plaintiff was granted a disability retirement in September 1996.

## II.  Legal Standards

### A.  **Motion to Dismiss Standard**

Defendant has moved to dismiss several of Plaintiff's claims pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.  A Rule 12(b)(1) motion allows a party to challenge the subject matter jurisdiction of the district court to entertain the complaint, Fed. R. Civ. P. 12(b)(1), while a motion

---

[21]
Exhibit Volume, Ex. 5-B, pp. 57-58.

[22]
Exhibit Volume, Ex. 5-B, pp. 55-56, 59-61.

9

under 12(b)(6) seeks dismissal of the complaint because it fails to state a legally cognizable claim upon which relief may be granted. Fed. R. Civ. P. 12(b)(6). Dismissal under either rule is appropriate only when it appears beyond a doubt that the plaintiff will be unable to prove any set of facts in support of its claim for relief. Hishon v. King & Spalding, 467 U.S. 69, 73 (1984); Lovick v. Ritemoney Ltd., 378 F.3d 433, 437 (5th Cir. 2004).

The court may decide a motion to dismiss for lack of jurisdiction on any of three bases: "(1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." Id. The court, in determining whether it is properly vested with subject matter jurisdiction, is "free to weigh the evidence and resolve factual disputes in order to satisfy itself that it has the power to hear the case." Krim v. pcOrder.com, Inc., 402 F.3d 489, 494 (5th Cir. 2005)(quoting Montez v. Dep't of Navy, 392 F.3d 147, 149 (5th Cir. 2004)).

When considering a Rule 12(b)(6) motion to dismiss, the court construes the allegations in the complaint liberally in favor of the pleader and accepts as true all well-pleaded facts. Hermann Holdings Ltd. v. Lucent Tech. Inc., 302 F.3d 552, 558 (5th Cir. 2002). The court may not rely on conclusory allegations or legal conclusions disguised as factual allegations. Jeanmarie v. United

10

States, 242 F.3d 600, 602 (5ᵗʰ Cir. 2001). However, when the moving party attaches matters outside the pleadings in support of his motion to dismiss, the motion must be treated as one for summary judgment. Fed. R. Civ. P. 12(c). Thus, the present motion must be considered under Fed. R. Civ. P. 56.

**B.   <u>Summary Judgment Standard</u>**

Summary judgment is warranted only when the evidence presented to the court fails to raise any genuine issues of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). A dispute is "genuine" if the evidence would permit a reasonable jury to return a verdict in favor of the nonmoving party. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986); <u>TIG Ins. Co. v. Sedgwick James of Washington</u>, 276 F.3d 754, 759 (5ᵗʰ Cir. 2002). A fact is "material" if the relevant substantive law identifies it as one that may reasonably affect the outcome of the case. <u>Liberty Lobby</u>, 477 U.S. at 248; <u>Ameristar Jet Charter, Inc. v. Signal Composites, Inc.</u>, 271 F.3d 624, 626 (5ᵗʰ Cir. 2001).

The movant must inform the court of the basis for a grant of summary judgment by identifying relevant excerpts from pleadings, depositions, answers to interrogatories, admissions, and affidavits on file, that demonstrate the absence of genuine issues of material fact. Fed. R. Civ. P. 56(c); <u>Celotex Corp.</u>, 477 U.S. at 323; <u>Topalian v. Ehrman</u>, 954 F.2d 1125, 1131 (5ᵗʰ Cir. 1992). If the

movant satisfies its burden, the adverse party must go beyond the pleadings and produce competent evidence that demonstrates genuine issues of material fact do exist which must be resolved by a trier of fact.   Fed. R. Civ. P. 56(e); Celotex, 477 U.S. at 324. However, to withstand summary judgment, the adverse party must show more than "some metaphysical doubt as to the material facts." Meinecke v. H & R Block of Houston, 66 F.3d 77, 81 (5th Cir. 1995). Likewise, conclusory statements, unsubstantiated assertions, and speculation are not sufficient to raise material fact issues for trial.   TIG Ins. Co., 276 F.3d at 759.   When deciding whether the evidence creates a fact issue, the court resolves all doubts and draws all justifiable inferences in favor of the party opposing the motion.   Liberty Lobby, 477 U.S. at 255; Fierros v. Tex. Dep't of Health, 274 F.3d 187, 190 (5th Cir. 2001).

### III.  Analysis

In his pending motion to dismiss or for summary judgment, Defendant advances three grounds for dismissal of Plaintiff's claims: (1) Plaintiff failed to exhaust her administrative remedies with respect to the gender discrimination and retaliation claims; (2) Plaintiff failed to prove that she was subjected to an adverse employment action or was qualified for her position; and (3) Plaintiff was not subjected to an objectively hostile work environment.   The court will address each argument in turn.

### A.  Title VII and the Exhaustion of Administrative Remedies

12

A federal employee's exclusive redress for unlawful discrimination experienced in the workplace is provided in section 717 of Title VII, 42 U.S.C. § 2000e-16(a)-(e). <u>Brown v. Gen. Servs Admin.</u>, 425 U.S. 820, 829 (1976); <u>Pacheco v. Rice</u>, 966 F.2d 904, 905 (5th Cir. 1992); <u>Henderson v. United States Veterans Admin.</u>, 790 F.2d 436, 439 (5th Cir. 1986). Section 2000e-16(c) gives a federal employee the right to file suit in federal court, but mandates that to do so, the employee must first pursue and exhaust administrative remedies against her federal employer. <u>Randel v. United Stated Dep't of Navy</u>, 157 F.3d 392, 395 (5th Cir. 1998); <u>Fitzgerald v. Secretary, U.S. Dep't of Veterans Affairs</u>, 121 F.3d 203, 206 (5th Cir. 1997); <u>Barnes v. Levitt</u>, 118 F.3d 404, 408 (5th Cir. 1997). Only when a federal employee exhausts her administrative remedies does a district court have jurisdiction to entertain her subsequent Title VII action. <u>Randel</u>, 157 F.3d at 395; <u>Dollis v. Rubin</u>, 77 F.3d 777, 781 (5th Cir. 1995); <u>Francis v. Brown</u>, 58 F.3d 191, 192 (5th Cir. 1995); <u>Tolbert v. United States</u>, 916 F.2d 245, 247 (5th Cir. 1990); <u>Hampton v. IRS</u>, 913 F.2d 180, 182 (5th Cir. 1990); <u>Prewitt v. United States Postal Serv.</u>, 662 F.2d 292, 303 (5th Cir. 1981).

To exhaust her remedies at the administrative level, a federal employee must satisfy the "rigorous administrative exhaustion requirements and time limitations" set out in section 717. <u>Brown</u>, 425 U.S. at 829. First, the employee is required to contact the

federal agency's EEO Counselor within forty-five days of the alleged discriminatory action and request informal counseling. 29 C.F.R. § 1614.105(a)(1);[23] see also Ramsey v. Henderson, 286 F.3d 264, 269 (5th Cir. 2002).[24] The EEO counselor must conduct a final interview with the employee no later than thirty days after the date the aggrieved employee contacted the agency's EEO office. 29 C.F.R. § 1614.105(d). If no informal resolution within the agency is forthcoming, the EEO counselor issues a written notification to the employee informing her of the right to file a formal complaint of discrimination with the agency. Id. § 1614.105(d).

Within fifteen calender days of receiving this notification, the employee must file a complaint of employment discrimination with the agency's EEO office. Id. § 1614.106(b); see also Barnes v. Levitt, 118 F.3d 404, 408 (5th Cir. 1997); Hoffman v. Boeing, 596 F.2d 683, 685 (5th Cir. 1979). If the employee fails to file the complaint within the fifteen-day limit, the agency is required to dismiss the entire complaint. 29 C.F.R. § 1614.107(a)(2). If the agency does not reach the merits of the complaint because the federal employee fails to follow one or more steps of the administrative process, the district court may not reach the merits

---

[23]

The EEOC, the agency that administers and enforces Title VII, has promulgated various regulations governing the processing of a complaint, pursuant to the authority granted it in 42 U.S.C. § 2000e-16(b).

[24]

In the case of an alleged discriminatory personnel action, the employee has forty-five days from the effective date of this action to consult an EEO counselor. 29 C.F.R. § 1614.105(a)(1).

14

of the claim.  Barnes, 118 F.3d at 408; Johnson v. Bergland, 614 F.2d 415, 418 (5th Cir. 1980).  Stated another way, if the employee fails to exhaust administrative remedies because of non-adherence to administrative procedures, the district court does not have jurisdiction to consider her claims.  Fitzgerald, 121 F.3d at 206; Tolbert, 916 F.2d at 248.

It is a well-established principle that the allegations in a judicial complaint filed pursuant to Title VII are limited by charges of discrimination "like or related to" the allegations contained in the EEOC charge and growing out of such allegations during the pendency of the case before the Commission.  Sanchez v. Standard Brands, Inc., 431 F.2d 455, 466 (5th Cir. 1970).

In her EEOC complaint, Plaintiff alleged that Defendant discriminated against her on the basis of her physical and mental disabilities.  She also claimed that she suffered from a disability-based hostile work environment because her supervisor micro-managed her use of sick and annual leave.  The decision rendered by the EEOC likewise only dealt with the issues of disability discrimination and hostile work environment based on the repeated counseling about taking sick and annual leave.

Accordingly, the court finds that it lacks subject matter jurisdiction over Plaintiff's gender discrimination and retaliation claims because Plaintiff failed to raise these claims prior to the institution of this action.  See Clayton v. Rumsfeld, 106 Fed.

15

Appx. 268, 271 (5th Cir. 2004) (finding that former employee failed to raise the issue of her constructive discharge in the administrative process, and thus, was precluded from pursuing that claim in her Title VII suit).

### B.   Disability Discrimination Claims

Plaintiff brings her disability discrimination claims pursuant to the Rehabilitation Act, which prohibits discrimination against federal employees with disabilities.   See 29 U.S.C. § 794(a).

The Rehabilitation Act incorporates the standards used in cases brought under the Americans with Disabilities Act, 42 U.S.C. 12102, et seq., which are subject to the Title VII burden-shifting analysis.   Daigle v. Liberty Life Ins. Co., 70 F.3d 394, 396 (5th Cir. 1995); see also Daugherty v. City of El Paso, 56 F.3d 695, 697-98 (5th Cir. 1995), cert. denied, 516 U.S. 1172 (1996).

In order to qualify for relief under the Rehabilitation Act, a plaintiff must prove that: 1) she was disabled or regarded as disabled; 2) she was qualified for the job; 3) she was subject to an adverse employment action on account of her disability; and (4) she was replaced by or treated less favorably than non-disabled employees.   Gowesky v. Singing River Hospital Systems, 321 F.3d 503 (5th Cir. 2003).   Defendant argues that Plaintiff cannot allege a prima facie case of disability discrimination because she has not suffered an adverse employment action and is not otherwise qualified for the job.

### 1.   The Requirement of an Adverse Employment Action

In the present case, Plaintiff complains about three employment actions. First, Plaintiff alleges that while on medical leave, she was transferred to another position because of her disability. Second, Plaintiff complains that Johnson denied her a total of eight hours annual leave on August 25 and 28, 1995, because of her disability. Finally, Plaintiff contends that she was terminated because of her disability, ultimately forcing her to apply for disability retirement.

The Fifth Circuit has stated that Title VII "was designed to address ultimate employment decisions, not to address every decision made by employers that arguably might have some tangential effect on those ultimate decisions." Dollis v. Rubin, 77 F.3d 777, 782 (5th Cir. 1995). The Dollis court found that hiring, firing, promoting, compensating, and granting leave were examples of ultimate employment decisions. Id. at 782.

The court first turns to whether Plaintiff's transfer is an adverse employment action. It is well-established that a purely lateral transfer cannot be considered an adverse employment action. See, generally, Burger v. Cent. Apartment Mgmt., Inc., 168 F.3d 875, 879 (5th Cir. 1999). The Fifth Circuit has held that a job transfer might be considered an adverse employment action if it is punitive, see Pierce v. Texas Dep't of Criminal Justice, Inst'al Div., 37 F.3d 1146, 1149 (5th Cir. 1994), or if it could be

considered a demotion, see Click v. Copeland, 970 F.2d 106, 110 (5th cir. 1992).  A transfer to an undesirable work assignment, without more, is not an adverse employment action.  Southard v. Texas Bd. of Criminal Justice, 114 F.3d 539, 555 (5th Cir. 1997).  The loss of some job responsibilities likewise does not qualify as an ultimate employment decision.  See Mota v. Univ. of Tex., Houston Health Sci. Ctr., 261 F.3d 512, 521 (5th Cir. 2001); Hernandez v. Crawford Bldg. Material Co., 321 F.3d 528, 532 f.2 (5th Cir. 2003)(listing cases with activities that the Fifth Circuit has held do not constitute ultimate employment decisions)  In Watts v. Kroger Co., 170 F.3d 505, 511-12 (5th Cir. 1999), the court found that a change in the employee's work schedule and a request that the employee perform new job tasks were not ultimate employment decisions.

In the present case, Plaintiff's transfer did not amount to an adverse employment action for two reasons.  First, she suffered no loss of pay or benefits in the transfer from Employee Development Manager to Correctional Program Coordinator.  Both positions were paid at the same GS-11 level, both involved work in an indoor office environment and both reported to the associate warden.

Second, Plaintiff's job duties remained administrative and people-oriented in nature.  In her former position, Plaintiff was responsible for implementing required training and certification programs for correctional officers.  In her new position, she was

to provide guidance to inmates upon their arrival at the camp and to prepare them for transition back into the community through a variety of programs, counseling, and lessons.[25]   She was also required to keep records of inmates' payments to the Financial Responsibility account.   Both positions involved training, but in the new position Plaintiff would be dealing with inmates, not correctional officers.

After considering all the summary judgment evidence, the court concludes that the differences in the specific job duties are not enough to render the new position a demotion.   Likewise, the new job duties are similar enough to her former job duties and do not raise a fact issue that the transfer was punitive in nature.   The mere fact that Plaintiff objected to the transfer or experienced stress upon reading the letter that announced the transfer does not convert an objectively non-offensive reassignment of job duties into an adverse employment action. In other words, Plaintiff's subjective view of her new duties does not raise a fact issue that the reassignment was either a demotion or punitive in nature.   The court concludes that Plaintiff has not raised a fact issue that the reassignment was an adverse employment action.

The court next turns to whether the denial of eight hours of annual leave was an adverse employment action.   The term "adverse

---

[25]
    Exhibit Volume, Ex. 5-Q, Letter to Plaintiff reassigning her to Correctional Program Coordinator.

employment action" is construed narrowly so that only "ultimate employment decisions" such as hiring, discharging, promoting, and compensating are actionable. <u>Pegram v. Honeywell, Inc.</u>, 361 F.3d 272, 282 (5th Cir. 2004). "Granting leave" has been recited as an employment action which may constitute an adverse employment action, <u>see</u> <u>Dollis</u>, 77 F.3d at 782, because, presumably, the earning of leave is a part of an employee's compensation.

Plaintiff argues that the Department of Justice's ("DOJ") leave policy elevates the denial of a leave slip to an adverse employment action because, under the policy, she had a right to take annual leave, and the policy provided that a leave request could not be denied arbitrarily or capriciously.[26]   Under Plaintiff's argument, the "granting leave" language of <u>Dollis</u> permits her to challenge any denial of leave as an adverse employment action.

Here, it is undisputed that Plaintiff was granted, or earned, annual and sick leave in the same manner as all other employees. She was not granted less annual or sick leave because of a perceived disability.  It is also undisputed that Plaintiff did not lose or forfeit any earned annual or sick leave, which might be considered a loss of compensation.

---

[26]   That policy provided that an employee had the absolute right to take annual leave, subject to the right of the supervisor to fix the time at which leave may be taken. See Exhibit Volume, Ex. 5-E, pp. 5, 10.  The policy also provided that the granting of annual leave was discretionary, but that a supervisor could not arbitrarily or capriciously deny a leave application.  <u>Id.</u> at p. 5.

The dispute arises over Plaintiff's request to use annual leave on one occasion, which was denied by her supervisor. Plaintiff had the same leave balances before the denial as afterward and lost nothing in terms of her compensation. The court has no trouble concluding that Plaintiff was granted leave under the same terms and conditions as all other DOJ employees and that the dispute concerning when annual leave could be taken does not affect Plaintiff's compensation. As Plaintiff has suffered no adverse employment action, she has failed to allege a prima facie case of disability discrimination concerning the denial of eight hours annual leave.

Finally, Plaintiff's allegation that she was terminated because of her disability has no merit.[27]   Although Defendant proposed to remove Plaintiff from her position due to her failure to return to work, Plaintiff's application for long-term disability was approved, mooting the termination action. Therefore, Plaintiff cannot claim that she suffered an adverse employment action in that regard either.

## 2.  The Requirement of Qualification for the Position

Even if Defendant is found to have terminated Plaintiff from her position on June 14, 1996, thus satisfying the prima facie case requirement of an adverse employment action, Defendant argues that Plaintiff cannot satisfy the second prong of her prima facie case

---

[27]     Defendant does not raise this argument.

of disability discrimination, that she was qualified for her position.  The court agrees.

In determining whether a person is qualified for her position, the court must consider whether the individual can perform the essential functions of the job, and if unable to do so, whether any reasonable accommodation by the employer would enable her to perform the functions.  <u>Chandler v. Dallas</u>, 2 F.3d 1385, 1393-94 (5th Cir. 1993).

The record reflects that Plaintiff received extensive FMLA leave and leave without pay from December 1995 to the date of her termination, all based on her representation that she was unable to work.  Her inability to work was also documented on numerous occasions by her treating physicians, who universally opined that her medical condition prevented her from returning to work. Plaintiff never requested any accommodation from Defendant in order to return to work.  In the May 13, 1996, letter to Plaintiff proposing to terminate her employment because of her failure to return to work from FMLA and additional unpaid leave, the Defendant requested that Plaintiff communicate any requests for accommodation to the warden.  In response, Plaintiff's attorney stated that it was Plaintiff's desire to seek a disability retirement, concluding that "we will not make any specific requests for accommodation at

this time."[28]  Plaintiff's request for a disability retirement was approved in September 1996.

Plaintiff has failed to raise a fact issue that she was able to perform her job duties at the time her termination was proposed, with or without accommodation.

### C.  Hostile Work Environment

To state a claim for a hostile work environment, a plaintiff must prove that: (1) she belongs to a protected class; (2) she was subjected to unwelcome harassment; (3) the harassment complained of was based on a protected characteristic; (4) the harassment adversely affected a term, condition, or privilege of her employment; and (5) the employer knew or should have known of the harassment and failed to take remedial action.  See Celestine, 266 F.3d at 353.  Where the plaintiff alleges she was harassed by a supervisor with immediate or successively higher authority over him, he need only satisfy the first four elements.  Faragher v. City of Boca Raton, 524 U.S. 775, 807 (1998); Felton, 315 F.3d at 484.  Once the plaintiff makes this showing, the employer is subject to vicarious liability for the discriminatory acts of its supervisory employee.  Faragher, 524 U.S. at 807.

For a hostile work environment claim to be actionable, the plaintiff must show that the harassment was sufficiently severe or

---

[28]

Investigative File, Vol. 2, Ex. 29.  Plaintiff's attorney requested several accommodations only if the disability retirement was not approved.

pervasive to alter the terms or conditions of employment and create an abusive work environment.  Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986); Celestine, 266 F.3d at 353.  To this end, the plaintiff must prove her work environment was both subjectively and objectively hostile, i.e., the plaintiff must subjectively perceive the unwelcome harassment as being severe or pervasive, and this subjective perception must be objectively reasonable.  Harris v. Forklift Sys., Inc., 510 U.S. 17, 21-22 (1993); Frank v. Xerox Corp., 347 F.3d 130, 138 (5th Cir. 2003).

In determining whether a workplace is hostile or abusive, the court examines all circumstances, and focuses on factors such as: the frequency of the discriminatory conduct; its severity; whether the conduct is physically threatening or humiliating, or instead a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.  Walker, 214 F.3d at 625 (quoting Harris, 510 U.S. at 23).

In the present case, Plaintiff alleges that she was subjected to a hostile work environment when her supervisor took the following actions:  (1) lectured her for leaving work on July 27, 1995, without obtaining his permission; (2) lectured her about submitting leave slips on or near the time that the leave was requested; (3) lectured her about abusing her leave and using annual leave for doctor appointments and other illnesses; (4) lectured her about using leave on Fridays; (5) rated her "good" on

24

her performance review, rather than "superior;" (6) delayed approving her leave slips until the last minute; (7) falsely accused her of using sick leave to travel to Odessa, Texas, to watch a high school football game; (8) interrupted her conversation with the warden during a meeting about her use of annual leave; and (9) generally kept tabs on her job performance and attendance. Plaintiff contends that these events caused her great anxiety and exacerbated her fibromyalgia.

While Plaintiff found these occurrences subjectively offensive, these events do not raise a fact issue that Plaintiff's work place was objectively hostile.  There is no question that Plaintiff used a significant amount of leave during the latter part of 1995.  A supervisor has a right to counsel an employee about leave usage and other performance-related issues.  The lectures that Plaintiff found objectionable occurred after she submitted leave slips and were not merely gratuitous lectures designed to upset Plaintiff on a daily or hourly basis.  A workplace does not become objectively hostile merely because an employee finds the supervisor's remarks unwelcome.

Additionally, the court notes that Plaintiff was never denied either sick or annual leave when the request for leave concerned an illness or doctor's appointment.  In fact, she was only denied eight hours of annual leave on one occasion which, even if it were deemed harassment, could not be considered either "pervasive" or

"severe."

After examining all the circumstances, the court finds that Plaintiff has not established the elements of a disability-based hostile work environment.

### IV.  Conclusion

Based on the foregoing, the court **RECOMMENDS** that Defendant's Motion to Dismiss or for Summary Judgment be **GRANTED** in all respects.

SIGNED in Houston, Texas, this 17th day of January, 2006.

Nancy K. Johnson
United States Magistrate Judge

26